IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHARLES E. ELMORE,

        Plaintiff,

                                   CV 11-6363-PK

                                   OPINION AND ORDER

v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

PAPAK, Magistrate Judge:

        Plaintiff Charles E. Elmore filed this action November 14, 2011, seeking judicial review of the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), and the parties have consented to adjudication by a Magistrate Judge. I have considered all of the parties' briefs

and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482

2 – OPINION AND ORDER

U.S. at 141.   If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).  If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record.  *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis, despite the limitations imposed by the claimant's impairments.  *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f).  In the event the claimant is

3 – OPINION AND ORDER

no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets its burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet its burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882;

4 – OPINION AND ORDER

*see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

## BACKGROUND

Elmore was born on February 13, 1966. Tr. 45.[1] He speaks English and completed the tenth grade. Tr. 811, 817. Elmore applied for DIB on March 13, 2006, alleging disability as of September 1, 2005 due to osteoarthritis, depression, and low back injury. Tr. 23, 45-49, 812. Elmore owns a car detail business with his wife. Tr. 354.

The administrative record contains numerous reports from Elmore's various treatment providers. The earliest medical report dates from March 10, 2005, at which time Elmore reported to psychiatric nurse practitioner Patricia Jarrett that he is depressed every day. Tr. 354. Elmore stated that he has smoked marijuana regularly since age thirteen, and described a history of foster care placement ending in adoption at age thirteen. *Id.* Jarrett noted that Elmore was admitted to Good Samaritan Hospital in Corvalis on November 4, 2002, with severe symptoms of possible bipolar disorder. Tr. 355. She diagnosed cannabis dependence, major depressive disorder, generalized anxiety disorder, and bipolar disorder II with multiple personality disorder traits. Tr. 357. Jarrett assessed a Global Assessment Functioning ("GAF") at 55. *Id.* On June 17, 2005, Jarret wrote that Elmore reported smoking about three quarters of a gram of marijuana per day.

On April 7, 2005, Elmore was seen by mental health provider Sena Benson-Arb, M.A., who assessed him as "very depressed, tired and 'worn out.'" Tr. 329. Benson-Arb noted that Elmore had not worked for a number of days due to low energy and flu-like symptoms. *Id.*

Tr. 346. On July 1, 2005, Benson-Arb assessed "moderate depressed symptoms, anxious, hopeless at times." Tr. 306. Benson-Arb challenged Elmore to end his marijuana use. Tr. 309.

On November 22, 2005 and January 13, 2006, Elmore reported back pain and discomfort to his treating physician, Dr. John Watkins. Tr. 398, 401, 1156. Watkins recommended that Elmore increase his Vicodin intake from one to two doses per day. Tr. 398. Elmore saw Watkins again on April 4, 2006. Tr. 234. At that time, Watkins noted that an MRI showed a small bilateral neural foramineral narrowing in conjunction with facet hypertrophy at L5-S1, but noted no visible nerve encroachment. Tr. 234. Watkins opined that Elmore could have a rotator cuff tear, and noted mild sideways scoliosis at the lumbar region and pain over Elmore's L4-L5 lumbar vertebrae. Tr. 234. Watkins also noted paraspinal spasms in Elmore's right lumbar region and into his buttocks with pain in the right sacroiliac. *Id.*

On April 27, 2006, occupational therapist Marilyn Morris evaluated Elmore's physical work performance. Tr. 254. Elmore reported an overall pain scale score of five on a scale of one to ten. Tr. 255. Morris opined that Elmore was "incapable of sustaining the Light level of work for an 8-hour day," and wrote that "no inconsistencies were noted during the testing." Tr. 429.

On May 23, 2006, Watkins reviewed Elmore's work performance test results and opined that Elmore exhibited "self limiting behavior" due to pain, and that he was "incapable of sustaining even a light level of work for an 8 hour day." Tr. 389. On June 22, 2006, Elmore reported to Watkins that he "has not been able to work … because of the consistent pain in his shoulder and low back." Tr. 387. On August 1, 2006, Watkins wrote that Elmore

> has been unable to work since January because of severe back pain and spasms …
> [Elmore] is still unable to do any type of work. At home, he tries to mow the yard and he
> will only get 1 strip of 40 feet before he cannot work behind the self propelled mower

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 11.

any longer.  On a flat level, he can walk about 10 blocks before his pain in the back get so
sever he cannot walk.

Tr. 381-82, 1137.  During an exam, Elmore exhibited signs of mild discomfort and changed

positions frequently.  Tr. 381, 1137.  Watkins opined that even light-duty work would increase

Elmore's pain and discomfort, and that Elmore was unable to work because of back pain and

spasms.  Tr. 381, 391.  He also opined that Elmore's back requires him to frequently change

positions, that his impairments produce fatigue and disabling pain, and that he is not able to

sustain full-time employment.  Tr. 493, 575, 579.

On July 18, 2006, CDIU investigator Stephen Baumgarte interviewed Elmore and his

family at Elmore's business.  Tr. 26, 513.  When Baumgarte arrived at Elmore's business, he

observed Elmore quickly emerge from his truck, run across the street, and run down a set of

steps in order to greet him.  Tr. 26, 513-25.  Elmore stated to Baumgarte that he was working

many hours per week.  *Id.*   During the thirty-minute interview, Elmore appeared to sit and move

comfortably, at one point drawing his knees to his chest.  *Id.*  He did not exhibit any signs that

physical activity caused him pain or difficulty, and appeared to move freely throughout each

position.  *Id.*

On January 16, 2007, Dr. Todd Lewis examined Elmore at Spine Center Northwest.  Tr.

420.  Lewis diagnosed "mechanical low back pain syndrome" and opined that Elmore is limited

to performing activities "within his level of comfort and tolerance."  Tr. 423.  Lewis opined that

Elmore's mechanical back pain related to facet problems with spondylosis.  *Id.*

On April 4, 2007, Watkins met with Elmore to review Dr. Lewis' findings.  Tr. 489.

During the visit, Watkins did not perform any "specific examination," but assessed mechanical

back pain and noted that there was no clear indication of spondylosis.  *Id.*  On April 14, 2007,

7 – OPINION AND ORDER

Elmore reported to Watkins that he was unable to afford physical therapy treatment due to lack of insurance. Tr. 1133.

On August 9, 2007, Elmore reported to Lincoln County Mental Health with depression. Tr. 1019. On August 21, 2007, Elmore told Watkins that the Duragesic patches he uses for pain are effective for two to twelve days. Tr. 1123. Elmore saw Watkins again on August 30 and September 5, 2007, for back pain problems. Watkins noted that the Duragesic patches were too strong, causing unwanted side effects. Tr. 485, 1115. On October 5, 2007, Watkins opined in a letter to Elmore's attorney that Elmore's ability to work a forty hour per week job "would be interrupted by frequent absences, on the order of 1 or more days per week (4 or more per month)." Tr. 493, 1111.

In October, 2007, Watkins opined that Elmore's problems might be related to his pain medication intake. Tr. 186. Elmore was admitted to Samaritan Pacific Communities Hospital on October 25, 2007 with complaints of nausea and vomiting. Tr. 185, 1102, 1106. On October 26, 2007, Elmore saw Joan Barry-Gertz, M.A., at Lincoln County Health and Human Services. Tr. 1010. Barry-Gertz performed a Behavioral Health Assessment. *Id.* At that visit, Elmore reported increasing paranoia, agoraphobia, sleep disturbances, appetite disturbance, sadness, tearfulness, suicidal preoccupation, and panic attacks. *Id.* Barry-Gertz noted Elmore exhibited extreme irritability, anger, and restlessness, and assessed a GAF score of 50. Tr. 1010, 1015. On December 14, 2007, Barry-Gertz diagnosed depression and generalized anxiety. Tr. 701. On January 29, 2010, Barry-Gertz expressed concern over Elmore's suicidal ideation. Tr. 673-74. She also noted that Elmore found it difficult to walk, maintain balance, and sit comfortably. Tr. 673. She opined that Elmore is unable to leave his home or go shopping, and has "developed intermittent suicidal ideation." Tr. 701.

8 – OPINION AND ORDER

On December 18, 2007, a hearing was held before an Administrative Law Judge. Tr. 497. At that hearing, Elmore testified that he could not work due to his bad back. Tr. 533. CDIU investigator Agent Baumgarte was present at the hearing and testified regarding his observations of Elmore at his workplace. Tr. 512-33. Elmore's attorney was able to cross-examine Baumgarte on the record. *Id.*

On January 30, 2008, Elmore complained of lumbar pain to Watkins, despite his use of ten milligrams of Methadone every eight hours. Tr. 1094. Watkins increased Elmore's Methadone dosage to twenty milligrams. *Id.* On February 6, 2008, Watkins noted that Elmore had been to the emergency room for nausea, vomiting and abdominal pain. Tr. 1087. Watkins assessed prolonged situational depression and suggested weaning Elmore off of Methadone, but continued Elmore on Lexapro. Tr. 1082.

On February 12, 2008, the ALJ denied Elmore's application for DIB benefits, finding that he had engaged in substantial gainful activity after the alleged disability onset date. Tr. 497-502. Elmore appealed to the Appeals Council, and the Council remanded the case for further consideration of the issue of substantial gainful activity. Tr. 564-568.

On May 13, 2008, Ronald Duvall, PhD, performed a psychodiagnostic evaluation of Elmore, and noted that he had suffered severe physical and mental abuse. Tr. 951. At the start of his report, Duvall disclosed that he had previous knowledge of Elmore though his auto-detailing shop. Tr. 949. He observed Elmore's thought process as both linear and tangential, and diagnosed major depressive disorder, bipolar disorder, pain disorder associated with both psychological factors and a general medical condition, and panic disorder with agoraphobia. Tr. 595. Duvall assessed Elmore's GAF score in the 45-50 range, and opined that Lexapro "is not clearly helping him with [his] set of anxiety disorder problems." Tr. 595, 953. Duvall opined

9 – OPINION AND ORDER

that Elmore's "ability to engage in appropriate social interaction is doubtful, since he is pain-centered, very anxious around others, and tends to burst into tears." Tr. 953.

On June 26, 2008, Dr. Martin Kehrli assessed Elmore as having the capacity to lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. Tr. 955-62. Kehrli opined that Elmore should avoid concentrated exposure to workplace hazards due to his chronic use of narcotic pain medication, but was otherwise capable of sustaining gainful employment. *Id.*

On June 27, 2008, State agency psychological consultant Bill Hennings, PhD, determined that Elmore's conditions as diagnosed by Duvall would cause him moderate restriction in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. Tr. 963-76. Hennings found no evidence of any episode of decompensation of extended duration, and concluded that Elmore would be capable of performing simple, unrushed tasks in a work setting where social interaction would not be required or would be minimal. *Id.* Hennings also noted that Elmore would need supervision which was not overly harsh or hypercritical. Tr. 983-84.

On July 14, 2008, Dr. Jutla evaluated Elmore at Oregon Health Sciences University's ("OHSU") pain clinic under the supervision of Dr. David Sibell. Tr. 1034. On physical examination, Elmore had normal cervical range of motion, normal shoulder range of motion, normal reflexes, and normal gait, with some limitations in Elmore's ability to flex and bend. Tr. 1044. Jutla opined that Elmore's pain may be attributable to his poor posture and past work using heavy buffing equipment. Tr. 1041.

Elmore appeared for a second hearing before an ALJ on February 2, 2010. At the hearing, Elmore testified that he had not attempted to find work that was less exertionally

demanding than his past relevant work as an auto detailer because he does not want to interfere

with his DIB application process. Tr. 1254. He testified that he is attempting to wean off

methadone, and that he had problems with anger at the time of his alleged onset date. Tr. 1254-

69. Elmore's wife Michelle also testified at the hearing, stating that Elmore believes that auto

detailing is the only type of work he can perform. Tr. 1270-90. She testified that Elmore was

kept "isolated" from the family business because his involvement would be too mentally taxing.

*Id.*

  After the second hearing, the ALJ again issued an unfavorable decision. Tr. 23-39.

Elmore timely requested review of that decision, and filed a subsequent claim for DIB on

February 27, 2008. This claim alleged an August 1, 2006 disability onset date, and was granted.

Tr. 566, 1228.

  On September 15, 2011, the Appeals Council issued a Notice of Action. The Notice

explained that Elmore's credibility was belied by the administrative record as a whole, and his

subsequent DIB application was granted based on a "one-time evaluation" by a consultative

DDS examiner[2] who gave Elmore "the benefit of the doubt." Tr. 9-10. The Council therefore

ordered that the ALJ had associated and adjudicated both of Elmore's DIB applications in the

decision under review. The Council found no reason to review the ALJ's decision denying

disability benefits. *Id.* The ALJ's decision became the Agency's final order for purposes of

judicial review, and this action followed. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v.*

*Apfel*, 530 U.S. 103, 107 (2000).

---

  [2] The evaluation took place on July 6, 2010. Tr. 10. The DDS examiner credited
Elmore's allegations regarding his mental impairments and assessed his global assessment
functioning at 25, indicating an inability to function in almost all areas. *Id.* Despite this low
GAF score, the DDS did not find that Elmore's mental impairments satisfied a listing, "as would
likely be the case if the GAF of 25 had been valid or accurate." *Id.*

11 – OPINION AND ORDER

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Elmore engaged in some substantial gainful activity between September 1, 2005 and August 1, 2006. Tr. 26-28.

At the second step, the ALJ found that Elmore's medical impairments of lumbar spine spondylosis with lower back pain, depression, panic disorder with agoraphobia, and pain disorder were "severe" for purposes of the Act. Tr. 28. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Elmore's impairments met or equaled any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 28. The ALJ therefore properly conducted an assessment of Elmore's residual functional capacity ("RFC"). Specifically, the ALJ found that during the relevant adjudication period Elmore had:

> the residual functional capacity to lift and/or carry 50 pounds occasionally, and 25 pounds frequently, stand and/or walk 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. He should avoid exposure to hazards. He is limited to simple, unrushed tasks, and should have either minimal or no social interaction. He would need supervision which is not harsh or hypercritical, but would not go so far as being in a sheltered setting.

Tr. 30. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Elmore's own statements regarding his symptoms. Tr. 30.

At the fourth step of the five-step process, the ALJ found that Elmore could not perform his past relevant work as an auto detailer. Tr. 37.

At the fifth step, the ALJ found in light of Elmore's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 38. Relying in part on the testimony of an objective vocational expert, the ALJ found that despite the limitations listed in his RFC, Elmore could perform occupations

12 – OPINION AND ORDER

including janitor, packing line worker, and marker II. *Id.* Based on his step five finding that Elmore could perform jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled. Tr. 39.

## ANALYSIS

Elmore argues that the Commissioner erred because he (1) improperly considered evidence provided by Baumgarte in evaluating Elmore's credibility; and (2) improperly failed to incorporate the opinions of six medical providers into the RFC. Because the Court finds that the ALJ's decision was legally sound and supported by substantial evidence, the Commissioner's decision is affirmed.

## I.      The ALJ's Credibility Finding

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter*, 504 F.3d at 1036. When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets the first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he

must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96–7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit has said that an ALJ also "may consider ... ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms, ... other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883. If the "ALJ's credibility finding is

supported by substantial evidence in the record, [the court] may not engage in second-guessing."

*Thomas v. Barnhart*, 278 F.3d 947, 949 (9th Cir. 2002).

Here, the ALJ properly found Elmore to be less than credible based on his history of

inaccurate statements to providers,[3] evidence that he was motivated by secondary gain,[4] and

evidence from Agent Baumgarte's investigation.  In his Amended Opening Brief, Elmore

challenges only the ALJ's use of evidence from Baumgarte's investigation.  *See Bray v. Comm'r*,

533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (refusing to address an issue that was not raised "with

any specificity" in claimant's opening brief).

### A.    Agent Baumgarte's Investigation

The ALJ relied on evidence from Agent Baumgarte's investigation in discounting

Elmore's credibility.  In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the

"inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct,

claimant's daily activities, [and] h[is] work record."  *Thomas*, 278 F.3d at 959 (internal

---

[3] *See* Tr. 32, 36, 880, 948-49, 990, 1045.  For example, in May 2006, Elmore told Duvall
that he had only twenty percent of his L5 vertebrae remaining.  Tr. 949.  This statement was
belied by an MRI scan from March 2006.  Tr. 948.  Using ordinary techniques of credibility
evaluation, the ALJ properly concluded that Elmore was less than credible.  *Smolen*, 80 F.3d at
1284.

[4] As noted, Elmore testified that he had not sought less demanding employment after the
alleged onset date because he did not want to interfere with his DIB application.  Tr. 36, 1254.  A
claimant's failure to pursue employment for reasons unrelated to disability is a clear and
convincing basis for discrediting his testimony.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th
Cir. 2008).  The ALJ thus had an additional basis for discrediting Elmore's credibility.

Citing *Ratto v. Secretary*, Elmore argues that he was here "simply and honestly
reiterating legal advice that was given to him."  839 F.Supp. 1428, 1429 (D. Or. 1993); Pl. R. Br.
7.  *Ratto*, however, is inapposite.  In *Ratto*, the court held it was error for the ALJ to discount the
claimant's credibility based solely on the fact that she was applying for disability benefits.  Here,
the ALJ discounted Elmore's credibility because he testified that he had failed to look for
appropriate employment based on his desire to obtain disability benefits.  Thus, the ALJ's reason
for doubting Elmore's credibility was based on evidence other than the mere fact that he had
applied for DIB.  The ALJ's reliance on evidence of Elmore's secondary gain motivation in his
credibility finding was proper.

modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  Where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed.  *Thomas*, 278 F.3d at 959, *citing Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999).

The record shows that Elmore told the Agency that he works at Chuckie D.'s Detail Shop ten hours per day, despite reporting to DDS that he had hired another individual to perform physical labor at the shop.  Tr. 73.  In order to resolve this conflict in the record, CDIU investigator Baumgarte conducted a "pretext interview" and observed Elmore perform physical activities without any signs of difficulty or discomfort.  Further, Elmore reported to Baumgarte that he worked "many hours," that business was good, and that he had recently purchased two BMW automobiles.  Tr. 75.  Baumgarte's observations conflicted with much of the evidence in the record that was based on Elmore's self-reporting regarding his limitations.  Specifically, Elmore's behavior and responses to the investigator suggested a much higher level of physical and mental functioning than Elmore reported to his medical providers and to the Agency in his applications.  The ALJ credited Baumgarte's statements in evaluating Elmore's credibility, and properly found Elmore not credible.  Tr. 26; *Thomas*, 278 F.3d at 959.

### 1.  Substantive Due Process Claim

Elmore argues that because Baumgarte interviewed him under false pretenses, "[t]he Agency should not be allowed to rely in any manner on the[ir] findings and investigation."  Pl. Br. 28.  Elmore thus asks that all evidence obtained by the CDIU investigator be excluded from the administrative record because the investigation violated his right to substantive due process under the federal constitution.

The Ninth Circuit has not addressed a substantive due process challenge to an Agency investigation. In the context of a harmless error analysis, however, the Ninth Circuit has observed that a Social Security claimant is not due greater protection than a criminal defendant. *Molina v. Astrue,* 674 F.3d 1104, 1120 (9th Cir. 2012). Courts have frequently observed that deception on the part of investigators is not an inappropriate practice by law enforcement officials. *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that police misrepresentation alone is not a basis for rendering a confession inadmissible); *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) ("trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless the government agents make threats or promises"). Moreover, the exclusionary rule as applied in other contexts does not operate in administrative law cases for unconstitutionally obtained evidence. Evidence may be received at any hearing "even though [such evidence would be] inadmissible under rules of evidence applicable to court procedure." 42 U.S.C. § 405(b)(1); *see also Richardson v. Perales*, 402 U.S. 389, 400 (1971) ("strict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent"). Thus, even unlawfully obtained evidence that would be excluded at trial of a criminal defendant is not automatically excluded from an administrative hearing.

Here, the CDIU investigation indicated that Elmore appeared to be working at his own business at a significantly higher level of physical and mental functioning than claimed in his applications for DIB. Thus, the evidence submitted by Baumgarte was clearly pertinent. Even if the means of obtaining such evidence were deemed unlawful, the inclusion of pertinent evidence in the administrative record in this context is appropriate. *See Richardson*, 402 U.S. at 400.

17 – OPINION AND ORDER

Therefore, the ALJ properly relied on the evidence from Baumgarte's investigation in making his credibility finding, and the ALJ's finding is upheld.

## II.    Medical Opinion Evidence

Elmore argues that the ALJ failed to incorporate the opinions of six different medical providers into the RFC.  If a physician's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating physician's opinion.  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).  Specific, legitimate reasons for rejecting a physician's opinion may include reliance on a claimant's discredited subjective complaints. *Tommasetti*, 533 F.3d at 1040; *see also Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995).  As discussed below, the ALJ properly discredited the six providers' opinions because they were based on Elmore's properly discredited subjective reports, and contradicted by other medical evidence in the record.[5]

### A.    Treating Physician John F. Watkins

As noted, Watkins was Elmore's primary care provider from March 2005 through the time of the ALJ decision.  The ALJ assigned "very little weight" to Watkins' opinion, finding it "completely inconsistent with the objective findings of record." Tr. 37.  The ALJ also noted that Watkins' records reflect that his visits with Elmore generally did not include any physical examination and were therefore based on Elmore's subjective complaints.  *Id.*

Watkins' opinion was contradicted by other medical evidence in the record.  On February 8, 2007, Dr. Todd Lewis examined Elmore at Spine Center Northwest and reported "no evidence of spondylosis." Tr. 420-21.  Lewis observed that Elmore had normal gait, normal ambulation,

---

[5] Elmore also argues that the ALJ failed to address the fact that the opinions of these six providers "all overlap." Pl. R. Br. 1.  The Court rejects this argument; any "overlap" in the opinions is due to each provider's reliance on Elmore's subjective complaints, and the ALJ

18 – OPINION AND ORDER

good balance and normal coordination. *Id.*, 1091. Lewis' observations contradict Watkins' opinion that Elmore's severe back pain renders him "barely" able to "lift his own body weight." Tr. 493. The ALJ was thus required to provide specific, legitimate reasons for rejecting Watson's controverted opinion. *Murray*, 722 F.2d at 502.

The ALJ noted Watson's opinion was largely based on Elmore's subjective complaints, which the ALJ properly found to be not credible. Tr. 37. A treating physician's limitations that are based on a patient's subjective characterization of symptoms are reasonably discounted when the ALJ finds the plaintiff less than credible. *Bray*, 554 F.3d at 1228. Thus, the ALJ provided a specific, legitimate reason for rejecting Watson's opinion. *Tommasetti*, 533 F.3d at 1040; *see also Andrews*, 53 F.3d at 1042.

### B.    Occupational Therapist Marilyn Morris

Morris evaluated Elmore's physical capacities on April 27, 2006. Tr. 254. She opined that Elmore is "incapable of sustaining the light level of work for an 8-hour day." Tr. 429. The ALJ did not incorporate this limitation into Elmore's RFC; instead, he gave "great weight" to Dr. Kehrli's opinion regarding Elmore's physical capabilities. As noted, Kehrli opined that Elmore was capable of sustaining gainful employment, subject to some limitations. Tr. 962. Thus Morris' opinion was controverted by medical evidence in the record, and the ALJ was required to provide specific, legitimate reasons for rejecting it. *Murray*, 722 F.2d at 502. Like Watkins' opinion, Morris' opinion was largely based on Elmore's subjective complaints. Because the ALJ properly rejected Elmore's credibility, he thus provided specific, legitimate reasons for assigning little weight to Morris' opinion. *Bray*, 554 F.3d at 1228.

### C.    Orthopedic Surgeon Dr. Todd Lewis

properly rejected those complaints.

19 – OPINION AND ORDER

Lewis conducted a full physical examination of Elmore and noted a slow onset of symptoms resulting in Elmore's chronic lower back pain. Tr. 420. As noted, Lewis diagnosed mechanical back pain relating to facet problems with spondylosis, and opined that Elmore was functionally limited to "performing activities within his level of comfort and tolerance." Tr. 423.

Lewis' opinion was also contradicted by Kehrli's opinion, and the ALJ provided specific, legitimate reasons for rejecting it. Specifically, the ALJ noted that Elmore's subjective reports of limitations due to pain were not credible. To the extent that Lewis' findings are based on Elmore's subjective symptom reports, the ALJ properly refused to incorporate those findings into the RFC. *Bray*, 554 F.3d at 1228.

### D.     Dr. Rajninder Jutla

As noted, Jutla evaluated Elmore on July 14, 2008 at OHSU. Jutla concluded that Elmore had not been able to work due to depression, PTSD, and chronic low back pain. Tr. 1045-46. To the extent that the ALJ failed to incorporate Jutla's findings into the RFC, that decision was legally sound for the reasons discussed above. *See Murray*, 722 F.2d at 502; *see also Bray*, 554 F.3d at 1228.

### E.     Joan Barry-Gertz, M.A.

On December 14, 2007, Barry-Gertz opined that Elmore could not leave his home or go shopping due to his mental issues. Tr. 701. The ALJ did not incorporate this limitation into the RFC. Instead, the ALJ credited the opinion of psychological consultant Hennings, who opined that Elmore was capable of performing simple, unrushed tasks in a work setting where social interaction would not be required or would be minimal. Tr. 963-84. Hennings' opinion contradicted the limitations assessed by Barry-Gertz, and the ALJ was thus required to provide specific, legitimate reasons for rejecting her controverted opinion. *Murray*, 722 F.2d at 502.

The limitations assessed by Barry-Gertz were based on Elmore's subjective self-reports regarding his mental issues. Because he found Elmore not credible, the ALJ properly rejected Barry-Gertz's opinion regarding Elmore's mental limitations. *Bray*, 554 F.3d at 1228.

### F.    Ronald Duvall, PhD

Finally, Elmore argues that despite giving "great weight" to Duvall's opinion, the ALJ failed to incorporate all of his findings into the RFC. Tr. 37; Pl. Br. 20. Specifically, Elmore alleges that the ALJ failed to include Duvall's finding that Elmore is unable to sustain attention and concentration, and that he is limited to remain in his home, removed from "the usual stresses and strains of adult living." Pl. Br. 20.

The ALJ found that Elmore was capable of work consistent with Hennings' assessment of Elmore's psychological limitations, and thus rejected Duvall's opinion to the extent that it contradicted Hennings' opinion. *Murray*, 722 F.2d at 502. Because Duvall's opinion was also predicated on Elmore's discredited subjective symptom reports, the ALJ had legally sufficient reason for rejecting the controverted aspects of Duvall's opinion. *Bray*, 554 F.3d at 1228. The ALJ's evaluation of the medical record was thus supported by substantial evidence and free of legal error, and is therefore affirmed.

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision in connection with Elmore's applications for disability insurance benefits is affirmed.

Dated this 15th day of July, 2013.

Honorable Paul Papak
United States Magistrate Judge

21 – OPINION AND ORDER